**RICHARD R. BEST**
**REGIONAL DIRECTOR**
Lara Shalov Mehraban
Sandeep Satwalekar
Mark R. Sylvester
Amy Mayer
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0159 (Sylvester)
sylvesterm@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    Plaintiff,<br><br>        -against-<br><br>**COINSEED, INC.** and **DELGERDALAI DAVAASAMBUU,**<br><br>                    Defendants. | **COMPLAINT**<br><br>21 Civ. _____ (     )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Coinseed, Inc. ("Coinseed") and its founder and chief executive officer Delgerdalai Davaasambuu ("Davaasambuu") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1.      From at least December 2017 to May 2018, Defendants offered and sold digital assets called "CSD tokens" as securities to investors, in return for consideration worth at least $141,000.  Defendants told investors that their investments would be used to develop Coinseed's

business, including a mobile phone application that purportedly enabled users to purchase and sell digital assets, and to pay other business expenses.

2. Defendants also offered and sold CSD tokens by promising that, in exchange for their investment, purchasers would receive a percentage of revenues that Coinseed generated in fees associated with the purchase and sale of digital assets on its platform.

3. Defendants offered and sold CSD tokens without registering the offering with the Commission as required by the federal securities laws, and no exemption from this registration requirement was available for the offering.

4. In connection with their offer and sale of CSD tokens, Coinseed never provided investors with the type of material information that issuers are required to include in registration statements when soliciting public investment. Instead, investors were left to rely only on the information Defendants chose to share about Coinseed and CSD tokens.

## VIOLATIONS

5. By virtue of the foregoing conduct and as alleged further herein, Defendants Coinseed and Davaasambuu violated Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c)].

6. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)].

8. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating Sections 5(a) and 5(c) of the Securities Act, pursuant to Section 20(b) of the Securities Act

[15 U.S.C. § 77t(b)]; (b) ordering Defendants to disgorge their ill-gotten gains with prejudgment interest thereon, pursuant to Section 21(d)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)(5)] and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7); (c) prohibiting Defendants from participating, directly or indirectly, in any offering of digital asset securities, provided, however, that such injunction shall not prevent Davaasambuu from purchasing or selling digital asset securities for his own personal account, pursuant to Sections 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; (d) ordering Defendants to pay civil money penalties, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

10. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

11. Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]. Defendants may be found in, are inhabitants of, or transact business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. At all relevant times, Coinseed's principal place of business was located in New York, New York, and Davaasambuu resided in New York, New York, and Defendants conducted the offering and sale of securities described herein while located in New York, New York.

**DEFENDANTS**

12. **Coinseed** is a Delaware corporation incorporated in November 2017, with its principal place of business in New York, New York.

13. **Davaasambuu**, age 34, is a citizen of Mongolia, and resided in New York, New York at all relevant times. Davaasambuu founded Coinseed, and he was at all relevant times and is currently Coinseed's chief executive officer ("CEO").

**STATUTORY AND LEGAL FRAMEWORK**

14. Congress enacted the Securities Act to regulate the offer and sale of securities. In contrast to ordinary commercial principles of caveat emptor, Congress enacted a regime of full and fair disclosure, requiring a company (an issuer) and its control persons who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

15. Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that, unless a registration statement is in effect as to a security or an exemption from registration applies, it is unlawful for any person, directly or indirectly, to sell securities in interstate commerce. Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides a similar prohibition against offers to sell or offers to buy, unless a registration statement has been filed. Thus, Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce absent an applicable exemption.

16. Registration statements relating to an offering of securities provide public investors with material information about the issuer and the offering, including financial and managerial information, how the issuer will use the offering proceeds, and the risks that affect the enterprise and an investment in its securities.

17. The definition of "security" under the Securities Act includes a wide range of

4

investment vehicles, including "investment contracts." An investment contact exists when there is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.

18. In addition to traditional instruments like stocks and bonds, courts have found that novel or unique investment vehicles constitute investment contracts. As the Supreme Court of the United States noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. 293, 299 (1946).

## BACKGROUND ON DIGITAL ASSETS AND DISTRIBUTED LEDGERS

19. The term "digital asset" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as digital "tokens," digital "coins," "cryptocurrencies," and "virtual currencies."

20. A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.

21. Entities have offered and sold digital assets in fundraising events, often called initial coin offerings, or ICOs, in exchange for consideration.

22. Issuers of digital assets typically release a "whitepaper" or marketing materials describing the project and the terms of the offering. To participate, investors typically transfer consideration—in the form of fiat currency or other digital assets—to the issuer's accounts. After completion of the offering, the issuer will deliver its unique digital asset to the participant's unique address on a distributed ledger or blockchain.

23. On July 25, 2017, the Commission issued the *Report of Investigation Pursuant to Section*

*21(a) of the Securities Exchange Act of 1934: The DAO* (the "DAO Report"), stating the Commission's view that digital assets may be securities, and that the federal securities laws and registration requirements "apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization, regardless whether those securities are purchased using U.S. dollars or virtual currencies, and regardless whether they are distributed in certificated form or through distributed ledger technology." The DAO Report focused on the *Howey* test, finding that the offering of digital assets at issue in that report were investment contracts and, therefore, securities.

## FACTS

### I. DAVAASAMBUU FOUNDED COINSEED AND DEVELOPED ITS PRINCIPAL PRODUCT, A MOBILE DIGITAL ASSET INVESTMENT APPLICATION

24. Davaasambuu founded Coinseed in approximately September 2017. He was and is Coinseed's CEO, and he developed its principal product, a mobile application that purported to, among other things, enable users to invest in digital assets.

25. Davaasambuu wrote all of the code underlying Coinseed's website and Coinseed's mobile application.

26. Coinseed launched its application on the two largest mobile phone operating systems in November 2017.

27. Coinseed marketed itself as a "spare change investing app," to which a user could link his or her credit or debit card and bank account. After a user made a purchase with a linked credit or debit card, Coinseed represented it would automatically "round up" the user's purchase to the nearest dollar, later withdraw the difference from the user's bank account, and then invest the difference between the purchase price and the "rounded up" amount in a basket of digital assets selected by the user.

28. In addition to this "rounding up" investment feature, Coinseed represented it would

6

display all users' portfolios along with their return percentages on its platform. Coinseed encouraged users to replicate the highest performing portfolios, which Coinseed represented could be accomplished by clicking a button that would convert a user's basket of digital assets to match the mix of assets in a selected portfolio.

29.     At all relevant times, Coinseed assessed a 1% fee on the total value of a user's portfolio every time he or she elected to convert his or her portfolio to match another user's portfolio. Coinseed referred to this fee as a "portfolio conversion fee."

## II.    DEFENDANTS OFFERED AND SOLD CSD TOKENS

30.     Coinseed offered CSD tokens for sale in two rounds, from December 2017 to January 2018, and from March 2018 to May 2018 (together, the "Offering").

31.     Davaasambuu wrote the code underlying the CSD token.

32.     To promote Coinseed's Offering, Davaasambuu drafted, reviewed, and approved two materially identical whitepapers (together, the "Whitepaper"), the first of which Defendants posted on Coinseed's publicly available website by no later than early December 2017.

33.     In the Whitepaper, Defendants described Coinseed's business plan, including its mobile application and portfolio conversion feature, and touted the Coinseed application as a "game-changer" that "will change how people invest."

34.     Defendants explained in the Whitepaper that, to achieve Coinseed's business goals, it "need[ed] the cryptocurrency community's support to accelerate [Coinseed's] growth and global expansion."

35.     Defendants stated they would use proceeds of the Offering, among other business purposes, for "[s]caling up the Coinseed platform in the US and globally." The Whitepaper also included a chart that showed that Coinseed would use the majority of investors' funds on "[m]arketing to [s]cale [u]p Coinseed."

36. To obtain the funds needed to expand their enterprise, Defendants marketed the CSD tokens to prospective investors with the promise of monthly profits, stating: "By supporting the Coinseed platform, you can share the profit by purchasing Coinseed's CSD tokens. We will distribute the share of the profit to the CSD token holders every month."

37. In a section of the Whitepaper entitled "Illustration of Benefits," Defendants promised that, as of May 2018, on or around the close of the Offering, CSD token holders would receive 50% of the revenue that Coinseed generated from portfolio conversion fees.

38. Defendants further represented that Coinseed would distribute this 50% of the portfolio conversion fee revenue to CSD token holders equally, on a monthly basis.

39. Defendants stated that Coinseed's management team, which included Davaasambuu, would be allocated 20% of the total available CSD tokens, with a vesting program that released tokens to the management team every six months for a two-year period. Defendants explained that this vesting program was established to "ensure the longevity of the project" and the commitment of Davaasambuu and Coinseed's management "to building the system in the long-term."

40. In addition to advertising the Offering on its website, Coinseed promoted investment in CSD tokens through its social media accounts and through press releases displayed on various digital asset-focused blogs.

41. Defendants ultimately raised at least $141,410 in sales of CSD tokens, obtained from hundreds of unique digital asset wallets, the vast majority of which were linked to unique email addresses, suggesting that hundreds of investors participated in the Offering.

### III. CSD TOKENS WERE SECURITIES

42. In *Howey*, the Supreme Court made clear that the determination of whether an instrument is an investment contract, and therefore a security, is a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by

8

those who seek the use of the money of others on the promise of profits."

43. At all relevant times during the Offering, Coinseed offered and sold the CSD token as an investment contract and therefore a security subject to the registration requirements of the federal securities laws.

### A. CSD Token Purchasers Invested Money

44. Investors purchased CSD tokens in exchange for the transfer of specified digital assets, including Ether, Bitcoin, Litecoin, or Dash, to Coinseed.

45. Such contributions to Coinseed constitute an investment of money by CSD token purchasers.

### B. Purchasers of CSD Tokens Invested into a Common Enterprise

46. Investors who purchased CSD tokens in the Offering invested into a common enterprise with other CSD token purchasers, as well as with Defendants.

47. According to Defendants, each holder of a CSD token was entitled to 50% of Coinseed's portfolio conversion fee revenues. As a result, the fortunes of each of the CSD token holders were tied to Coinseed's success and profitability. In other words, if Coinseed attracted application users who, in turn, utilized the portfolio conversion feature, then both Coinseed and CSD token holders would reap rewards in the form of portfolio conversion fee revenues. CSD token holders' profits were thus directly intertwined with Coinseed's success or failure in attracting additional users to its mobile application and promoting its portfolio conversion feature, which in turn would generate greater or lesser portfolio conversion fee revenue.

48. Defendants represented in the Whitepaper that Coinseed would collectively use the proceeds raised from the Offering to, among other things, develop and expand Coinseed's platform and mobile application, and, according to Davaasambuu, Defendants actually pooled funds raised from the Offering in wallets Coinseed used for its operations.

49. Defendants further represented to prospective investors in CSD tokens that investors would share pro-rata in the portfolio conversion fee revenues generated on the platform, as a type of dividend.

50. Investors' fortunes also were linked to those of Defendants. Coinseed's management team, which included Davaasambuu, were to be allocated 20% of CSD tokens in the Offering, thus significantly intertwining the fortunes of the investors and Davaasambuu.

51. In addition, Coinseed and the CSD token purchasers' fortunes were both tied to individuals' use of Coinseed's application and portfolio conversion feature. Both would make more money if more individuals used the application and conversion feature, and less money if fewer individuals did so. Coinseed also represented that a percentage of the revenues generated on its platform would be shared with investors, thereby further linking the fortunes of Coinseed and CSD token purchasers.

### C. Reasonable CSD Token Purchasers Would Expect a Profit from Defendants' Efforts

52. Reasonable CSD token purchasers expected value from the token due to their entitlement to 50% of Coinseed's portfolio conversion fee revenues.

53. Defendants did not represent that CSD tokens had any consumptive use, either on the Coinseed platform or elsewhere, and the CSD tokens did not have any such use.

54. Instead, Defendants led investors to expect, and reasonable investors would expect, that they could reap a profit from their investment in CSD tokens, derived from Defendants' efforts.

55. Defendants' Whitepaper emphasized opportunities for potential profit for investors in CSD tokens, stating the "benefits" of investment consisted of the right of investors to receive a specified monthly percentage of Coinseed's portfolio conversion fee revenue stream.

56. At the time of the Offering, CSD tokens had no use other than as sources of profit

linked to this revenue stream.

57. Coinseed and Davaasambuu made attempts to list the CSD token for trading on the secondary market but were ultimately unsuccessful.

58. Purchasers of CSD tokens were entirely passive, and had no control over Coinseed's management or operations, its mobile application, or any other aspect of its business.

59. Investors in CSD tokens reasonably relied on the managerial and entrepreneurial efforts of Defendants to establish, operate, and expand use of Coinseed's mobile application, which would, if successful, result in increased dividends for CSD token investors. Defendants conveyed to prospective investors that Coinseed's management team's efforts were critical to Coinseed's success, explaining in the Whitepaper that the vesting program applicable to the distribution of CSD tokens to Coinseed's management team was designed to "ensure [their] commitment to building the system in the long-term."

## IV. DEFENDANTS FAILED TO REGISTER THE OFFERING WITH THE COMMISSION

60. Defendants used interstate commerce for the Offering by, among other things, promoting investments in CSD tokens on Coinseed's publicly available website, created and maintained by Davaasambuu.

61. Defendants never filed a registration statement with the Commission with respect to their offer or sale of CSD tokens.

62. Defendants' offer and sale of CSD tokens were not exempt from the registration requirements of the Securities Act.

63. At the time of the Offering, Defendants' public disclosures failed to disclose the information required within a registration statement.

64. CSD token purchasers and the market thus lacked the information that issuers provide under the Securities Act when they solicit public investment.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Sections 5(a) and (c)**
**(Both Defendants)**

65. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 64.

66. Coinseed and Davaasambuu, directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

67. By reason of the foregoing, Coinseed and Davaasambuu violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a), 77e(c)];

**II.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with

pre-judgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7);

### III.

Prohibiting Defendants from participating, directly or indirectly, in any offering of a digital asset security pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; provided, however, that such injunction shall not prevent Davaasambuu from purchasing or selling digital asset securities for his own personal account;

### IV.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)]; and

### V.

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
       February 17, 2021

*Richard R. Best*

RICHARD R. BEST
REGIONAL DIRECTOR
Lara Shalov Mehraban
Sandeep Satwalekar
Mark R. Sylvester
Amy Mayer
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0159 (Sylvester)
sylvesterm@sec.gov